**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>XAVIER LOPEZ,<br><br>*Defendant*. | Case No. 3:23CR79 |

## POSITION OF THE UNITED STATES WITH RESPECT TO SENTENCING

The United States of America, through its attorneys, Jessica D. Aber, United States Attorney, and Thomas A. Garnett, Assistant United States Attorney, hereby submits its position with respect to sentencing for defendant Xavier Lopez. The United States has reviewed the Presentence Investigation Report (PSR), Dk. No. 63, and does not dispute any of the facts or factors set out therein.

The defendant's applicable Sentencing Guideline range, based on his Total Offense Level of 27 and his Criminal History Category of II, is 78 – 97 months of imprisonment. PSR ¶¶ 71-72.

After careful consideration of each of the statutory factors enumerated in 18 U.S.C. § 3553(a), the United States recommends that the Court vary upward from the advisory Guideline range and sentence the defendant to a term of 120 months of imprisonment. Such a sentence acknowledges and accounts for the violent nature and extent of the defendant's criminal conduct; the need to deter both this defendant and others who would seek to emulate his actions; and the urgent need to protect the public from the future crimes of a defendant vocally determined to commit them. A sentence of 120 months is sufficient, but not greater than necessary, to accomplish the sentencing objectives set forth in 18 U.S.C. § 3553(a).

## BACKGROUND

The defendant's presence in federal court is the (fortunate) culmination of the defendant's years-long commitment to following a steady and unbending pathway from radicalization to violence. The defendant's apocalyptic worldview—espoused with increasing vehemence over the course of his radicalization—underpinned his fervent conviction that it is his holy calling to wreak violence on religious and racial minorities, law enforcement officers, and anyone else whose political, religious, or cultural views differ from the defendant's self-described neo-Fascist ideology.

The defendant's pathway to violence began (or at least, accelerated) shortly after he moved to Virginia upon graduating high school in New York State. Not long after moving into his aunt's Henrico residence, the defendant's tendency towards self-radicalization became concerningly evident, and for the first time, caught the attention of law enforcement officers, who were alerted to the defendant's evolving radical views through the defendant's (typically anonymized) social media postings, which espoused violent antisemitic and white supremacist themes and imagery.

Soon enough, the defendant turned his violent rhetoric into correspondingly violent action—pacing through his suburban neighborhood, wearing camouflage and carrying a flag associated with the Confederacy, and wielding a knife that he used to slash the tires of cars whose owners had displayed a political symbol the defendant disapproved of. When police officers located and arrested the defendant, he violently resisted—first attempting to gain control of a knife despite his handcuffs, and then physically assaulting the officer who tried to restrain him. Police officers searching the defendant's residence that same day uncovered the defendant's firearms assembly workshop, and would later seize rifle components, magazines, and more than a thousand rounds of ammunition after his felony conviction.

Convicted of Felony Vandalism in 2021, and sentenced to a year in state prison, the defendant spent his time behind bars planning how to rebuild his arsenal and to prepare for his sought-after race war. In a letter he sent to his aunt (and housemate), the defendant fomented against "Jews, Liberals, communists, degenerates, Zionists," vowing to "destroy them." The defendant promised that upon his release, he would return to their shared residence and "build guns, explosives, and other forms of weaponry," and that he expected his relative's silence and cooperation as he built his lethal arsenal.

When the defendant walked out of state prison in June of 2021, he busied himself not with schooling or employment—instead, he turned to the internet, where he worked to radicalize and recruit others to his cause, instructing his online followers on how to build and employ explosives and untraceable firearms; which targets to attack; which people to kill. Nor did the defendant confine his activities to teaching and recruiting—instead, true to his words, he followed his own instructions: he assembled explosive devices; he obtained ammunition; he (anonymously) purchased a firearm build kit; he obtained a 3D printer; and he labored to construct an untraceable firearm using that build kit and his 3D printer.

When law enforcement executed a search warrant at the defendant's residence in November of 2022, they learned that they had moved just in time. Sitting in the defendant's bedroom were fully-constructed and operational Molotov cocktails; a box of 9mm hollow-point handgun ammunition; and the defendant's attempts to 3D-print the final, missing piece of the 9mm handgun build kit he had purchased online. Following his arrest, the defendant—a true and committed believer in his violent crusade—was defiant: asked by a law enforcement officer about his online postings instructing his followers to shoot police officers, the defendant affirmed his homicidal intent---"*If you have the means*."

The defendant had been just hours or days away from finally possessing the last of the "means" that he would need to finally put into execution the slaughter he had been advocating for and dreaming of for the past four years—that is, a self-constructed and untraceable 9mm handgun, built to chamber and employ that 9mm hollow-point ammunition, in concert with more than a half-dozen incendiary grenades.

The defendant was charged in a two-count Indictment returned by an Eastern District of Virginia grand jury on June 22, 2023, with (in Count One) Possession of Ammunition by a Convicted Felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2); and (in Count Two) with Possession of a Destructive Device, in violation of 26 U.S.C. §§ 5841, 5845, 5861(c)-(d), and (f). Dk. No. 6, PSR ¶ 1. The defendant plead guilty to Count Two of the Indictment on March 5, 2024. Sentencing is set for January 29, 2025.

**POSITION ON SENTENCING**

Following the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), the Sentencing guidelines are "effectively advisory." *Id.* at 245. Nonetheless, the advisory nature of the Guidelines "does not mean that they are irrelevant to the imposition of a sentence." *United States v. Moreland*, 437 F.3d 424, 432 (4th Cir. 2006); *see also United States v. Green*, 436 F.3d 449, 455 (4th Cir. 2006). Indeed, the Guidelines "seek to embody the Section 3553(a) considerations, both in principle and in practice." *Rita v. United States*, 551 U.S. 338, 350 (2007). Thus, a sentencing court "must consult [the] Guidelines and take them into account when sentencing" to "provide certainty and fairness in meeting the purposes of sentencing, [while] avoiding unwarranted sentencing disparities." *Booker*, 543 U.S. at 264 (internal quotation omitted); *United States v. Biheiri*, 356 F. Supp. 2d 589, 593 (E.D. Va. 2005).

A sentencing court should first calculate the range prescribed by the sentencing guidelines

after making the appropriate findings of fact. *See United States v. Hughes*, 401 F.3d 540, 546 (4th Cir. 2005). Following that calculation, a sentencing court must then "consider that range as well as other relevant factors set forth in the guidelines and those factors set forth in [18 U.S.C.] § 3553(a) before imposing the sentence." *Id.*

**A. The Advisory Guidelines Range**

As noted above, the United States has no objection or corrections to the PSR. By separate filing, the United States will move the Court to award a one-level decrease in the defendant's offense level pursuant to U.S.S.G. § 3E1.1(b). With this reduction, the defendant's Total Offense Level is 27 and his Criminal History Category is II. This yields a Guidelines range of 78 to 97 months' imprisonment. PSR ¶¶ 71-72.

**B. 18 U.S.C. § 3553(a) Factors**

After the Court has properly calculated the Guidelines range and ruled upon all departure motions, the Court must then consider the factors identified in 18 U.S.C. § 3553(a) to fashion a reasonable sentence. *Gall v. United States*, 552 U.S. 38 (2007). Here, the 3553(a) factors discussed below support an upward variance from the defendant's advisory guidelines range.

**1. <u>Nature and Circumstances of the Offense</u>**

The defendant's PSR provides a relatively fulsome recitation of the totality of the defendant's offense conduct and his concerning personal history, and while the United States will not attempt to re-summarize or condense that information, the undersigned provides the following information to supplement and expound on that already before the Court.

***A. Initial Radicalization***

The Federal Bureau of Investigation first became aware of—and increasingly concerned by—the defendant's violent and racially-motivated ideology in 2019, upon learning of the

defendant's association with an Instagram account belonging to the user "slenderman14w." Investigators understood the user's selection of "14w" to be an abbreviation of a phrase ("14 words") that itself summarizes the widely-used white supremacist slogan "*We must secure the existence of our people and a future for white children*." The defendant utilized the "slenderman14w" account to post tributes of himself from the purported perspective of an admiring follower / devotee of the defendant's armed "struggle" against various anti-fascist forces and minority groups, as well as to post antisemitic imagery and rhetoric—for example, declaring marriages between individuals of different racial heritages to be "*race treason*," a "*Capital Offense*" punishable by "*Death*." PSR ¶ 5.




The defendant utilized other social media accounts to more openly disseminate his views, as well—to include, for example, an account on the platform Gab, employing the username "Xavier Large Lexington." The defendant's postings revealed his admiration for other individuals who had committed violence in the name of extremist ideologies, including approving references (*see below*) to the mass murderer Brenton Tarrant, an Australian citizen who livestreamed (on a message board popular with the far-right) a video of the first of his two shooting attacks at mosques in Christchurch, New Zealand on March 15, 2019.[1] Tarrant described his motivations for the

[1] Combatting Terrorism Center at West Point, "The Christchurch Attacks: Livestream Terror in the Viral Video Age," July 2019 (https://ctc.westpoint.edu/christchurch-attacks-livestream-terror-viral-video-age/).

slaughter—having killed 51 people and wounded at least 40 more—as driven by his white supremacist views.[2]




The defendant did not just admire these mass murderers—he aspired to join their ranks, and make his own bloody contribution to their ideological struggle. To this end, the defendant began assembling what could only be described as a firearms manufacturing workshop and ammunition depot in the residence he shared with his aunt, stockpiling assault rifle parts, machining equipment such as drills and drill presses, assault rifle magazines, and assault rifle ammunition. Investigators would later confirm that the defendant had purchased an AR-15 style rifle in September of 2019, and that he had purchased 1,000 rounds of corresponding .223 and 5.56mm rifle ammunition (and 10 rifle magazines) in November of 2019.

2 A review of the defendant's devices following his arrest in November of 2022 confirmed that the defendant had, in fact, obtained and still possessed Tarrant's livestream video of the massacre.

### *B. Acceleration into Violence*

On August 17, 2021, the defendant armed himself with a knife, and dressed in camouflage and carrying a flag associated with the Confederacy, stalked through his suburban Henrico neighborhood. He used the knife to slash the tires on cars belonging to neighbors who had



displayed political signs in their yards that espoused views apparently abhorrent to the defendant. Law enforcement officers located and arrested the defendant the next day. While being transported in an officer's patrol car, the defendant—while handcuffed—gained control of a knife, and attempted to open the blade. After initially ignoring the officer's commands to drop the knife, the defendant physically assaulted the officer as he was being removed from the patrol car—repeatedly kneeing and headbutting the officer, eventually taking both to the ground before other officers arrived and subdued the defendant.

Local law enforcement officers executed a search warrant at the defendant's residence, uncovering the defendant's growing arsenal of weapons and ammunition—as well as machining and drilling tools the defendant was using to assemble assault rifles.









In total, police recovered more than 1,000 rounds of 5.56mm / .223 caliber ammunition[3]; (15) AR-style magazines with 30 round capacity; two (2) 40 round AR-style magazines; four (4) AR-15 80% lower receivers (also referred to as "80% lowers")[4]; a jig kit for AR-15 80% lower receivers[5]; three (3) complete AR-style upper receivers[6]; four (4) AR-style trigger/handle kits; and four (4) AR-style rifle stocks.

The defendant was convicted in Henrico County Circuit Court of Intentional Damage to Property (Over or Equal to $1,000) on January 7, 2021, and ultimately sentenced to an active term of one year imprisonment.

***C. Incarceration – Planning and Manifesto***

The defendant spent his year in state prison in regular communication with his aunt. During his telephone conversations—automatically recorded on the prison's phone system—the defendant made clear that his commitment to his radical ideology had not diminished: instead, it intensified. Despite his relative's attempts to steer the defendant away from potentially incriminatory language on the recorded phone lines, the defendant pressed ahead, repeatedly

---

3 The caliber of ammunition utilized by AR-15 style rifles—lightweight, semi-automatic, magazine-fed firearms.

4 A "lower receiver" is an integral portion of a functioning firearm, connecting to the other pieces of a finished firearm and to which the trigger group, upper receiver, and frame are attached. A completed lower receiver is a "firearm" under United States Code, and is required to bear a serial number. An "80% lower" is an unfinished lower receiver. This unfinished receiver does not have certain holes drilled out that would be required for the firearm to function. As the "80% lower" is not a completed "firearm" for purposes of United States Code, the purchase of this item does not require the background check and traditional requirements for the purchasing a working firearm.

5 In order to convert an "80% lower" into a fully-operable lower receiver (that is, a "firearm" for purpose of United States Code), an individual can utilize specialized machinery (such as a router or drill press) and a "jig kit" (a template for the proper placement of the final drill holes) to drill out the remaining holes.

6 An "upper receiver" is another necessary component of an AR-15 style rifle, connecting the barrel, bolt carrier group, and charging handle to the AR-15's lower receiver. Other components of an AR-15 style rifle include a trigger and handle kit, as well as a stock (the back portion of a rifle, often referred to as a "shoulder stock" or "buttstock").

describing his intention to move forward with his plans (on January 1, e.g., stating that "*now that the illusion is gone, everything is going to break loose*". . . "*especially since this case has essentially given me the green light*"); his pronunciation (on January 26) that the time to choose between "*the law and the Lord*" was "*imminent*," and that his family member should, "*whenever I get out, make sure the pickup truck is there*"[7]); his belief that he had a holy obligation to act (on January 30, e.g., stating "*I chose the Lord over the law*"); and his continued militant interests (on May 6, "*just so you know, I'm gonna need soldiers when I get out*", and on May 16, ". . . *only a few Israelis died, we need to pump those numbers up*"). The defendant also requested that his family member obtain and send him reading material associated both with his oft-expressed antisemitic and his anti-government views (to include, e.g., *The Turner Diaries*[8]).

On May 28, 2021, one month before his release date, the defendant mailed a letter to his family member. *See* Gov't Exhibit One (highlighting added). That document—spanning five looseleaf pages—served as the defendant's quasi-manifesto, outlining:

- The defendant's apocalyptic and violent world view, underpinned by his belief that "*our government is evil,*" and his belief that "*all that needs to be done is for us to truly unite in Christ Jesus and make total war against the Satanic occultist Government . . .*";
- The defendant's desire to learn "*to spot*" and "*how to destroy*" a broad swath of humanity—a list of those the defendant had marked for death that included "*Jews,*

[7] The defendant spoke multiple times to his relative about the need to acquire a pickup truck with "off-road capabilities"), and he did in fact acquire a Toyota Tacoma pickup truck approximately two days prior to his arrest (the defendant was behind the wheel of this pickup truck when he was arrested by Henrico County Police Department officers on November 13, 2022).

[8] First published in 1978, this book has been described as an "apocalyptic tale of genocide against racial minorities set in a near-future America," and a reference and/or inspiration for violent white supremacist actors such as Oklahoma City bomber Timothy McVeigh. *Encyclopedia Brittanica* (https://www.britannica.com/topic/The-Turner-Diaries), last visited August 27, 2024.

*Liberals, communists, degenerates, Zionists, progressives, capitalists, globalists, and green-party PETA-type environmentalists* . . .");

- The defendant's preference to "*die by the sword for the Lord's name than to live long on earth peacefully serving Satan's laws*."

The defendant explained that upon his release from prison, he intended to begin to reassemble his forfeited arsenal, building up his supply of weapons, ammunition, and explosives—and that he expected his family member's silence and cooperation as he pursued this goal:

"*It must be said that unless I am able to build guns, explosives, and other forms of weaponry & store them in my room without fear of the law finding out about it from you, I cannot fully trust in anything you say or do.*"

The defendant signed his manifesto "*Xavier Lopez, 21st century crusader*." On June 28, 2021, the defendant was released from state prison, and returned to his aunt's residence.

***D. Post-Release – Final Preparations***

In the days and months following his release, the defendant returned, as he had promised, to working towards his self-professed mission.

1. <u>Firearms Research</u>

The defendant—now a convicted felon, legally prohibited from possessing firearms or ammunition—promptly began traveling to the firearms sections of numerous sporting goods stores. The defendant completed the first of these visits less than a week after his release from state prison, traveling at least 60 miles from his Henrico residence to a sporting goods store located in Charlottesville, Virginia on July 4, 2021. During this visit, the defendant and his family member moved to the store's firearm section, where the defendant spent time looking at the firearms (displayed in glass cases) offered for sale. PSR ¶ 6.

During another visit (on a later date) to the firearms section of a different sporting goods store, federal investigators learned from store personnel that the defendant had engaged in a conversation with an employee in the firearms section about the defendant's interest in firearms—specifically, that the defendant had described wanting to build a .308 caliber rifle with an 11.5-inch barrel, and that he (the defendant) wanted to locate 168 grain Winchester 308 ammunition to use with that rifle. *Id*.

2. Online Recruitment & Incitement

The defendant returned to the internet, as well—seeking out the same online fever swamps where his descent into radicalization had first been detected by law enforcement. Aware that the defendant had previously been active online (that is, prior to his state arrest and conviction in 2020), law enforcement officials began to investigate the defendant's current online activity. Investigators confirmed that the defendant's residence in Henrico was assigned a discrete Internet Protocol (IP) Address of 73.12.94.90. A review of the online activity conducted through that IP Address established that this IP address had been used to access a specific social media account ("Cru54d3r") on the "Gab" platform, and to make numerous postings on that account. *See* Gov't Exhibit 2 (selected postings, highlighting added); PSR ¶ 7.

Those postings, completed in the months and weeks preceding the defendant's arrest on the instant federal charges, reflect the defendant's vociferous contempt for governmental authority and law enforcement, including repeated calls for the killings of police officers:

> *[H]ave no tolerance for cops. if they come to your house, that's your cue to shoot them. if you hear of cops at your white neighbor's house, that's also your cue to shoot them. if you hear of cops beating up a white man in your area, get together to attack the whole police department and even go so far as to break your white brothers out of prison if possible.*"

The postings also reflected the defendant's rejection of the legal prohibition on convicted felons' possession of firearms, and his exhortations to others to follow his example.[9] The defendant's confidence and commitment to his violent ideology had grown during his incarceration—now, he assumed the role of instructor and advocate, inciting his followers to:

- **Manufacture untraceable firearms**: "*All real weapons should be built, not bought, this can be done with a 3D printer and a parts kit, both of which can quite easily be bought untraceably* . . ." To this end, the defendant provided his online followers with links to video tutorials demonstrating precisely how they could accomplish this process on their own:[10]




- **Exercise operational security and evade law enforcement detection:** ". . . [the above-cited purchases of firearm build kits could be completed] "*untraceably if everyone in the group holds mail for each other, and any debit gift cards used are purchased with cash and registered under a pseudonym when necessary* . . ."

---

[9] To cite one example, from a posting made on October 5, 2022: "*@Lilr and no, being a convicted felon is not at all a valid excuse for remaining unarmed, stay strapped or get clapped. If you don't have a gun yet, at least acquire the means to make one, parts kits are everywhere and 3d printers are pretty cheap now too. You can also have a decent side hustle selling your builds to our white brothers across the pond and all around the world for monero over TOR or isp*." Gov't Exhibit 2 at 3.

[10] Gov't Exhibit 2 at 5.

- **Identify which weapons and ammunition should be selected for attacks**: "*. . . ammo and magazines should be standardized for each type (carbines being .223/5.56 and STANAG mag compatible, shotguns being .12 gauge, handguns being 9mm and Glock mag compatible, etc.)…*"
- **Identify ways to obtain weapons and ammunition:** "*raid*[ing] *a military or police armory*"
- **How to build improvised explosive devices**: "*manufacture pipe bombs using match heads or mix acetone and either 35% peroxide and Styrofoam*" in order to "*take over territory and destabilize the system*."

Throughout these postings, the defendant returned repeatedly to the fundamental principle underpinning his plans for violent action—his deep and abiding hatred for racial and religious minorities. The defendant exhorted his online followers to "*start ganging up on and beating every nigger and kike you see*," and to remember, above all, that "*this is total war . . . let's start acting like it*." The defendant cited the mass murders committed by other white supremacists as examples to be emulated, followed – and improved upon:

> *". . . Whatever action you are able to do and get away with. Just do it. Be smart and plan it out. Set a date. Slowly and methodically select your target and gather the necessary info and supplies. War is an art. Become the artist. Your target is your canvas. The blood you will spill and shed in your act is the paint, your action is the brush. Make a masterpiece. Select your target wisely and learn from the mistakes of your predecessors. Ensure that no matter what it hurts the kike system more than the cause. Brevik[11] was the best example of this thus far, but we can do even better . . ."*[12]

---

[11] Anders Behring Brevik is a Norwegian citizen convicted of killing more than 70 people on July 22, 2011 in two separate incidents involving Brevik's use of both explosives and firearms. Brevik explained that his decision to conduct this mass killing was motivated by his fervent belief in far-right ideologies.

[12] Gov't Exhibit 2, at 4 (highlighting added).

The defendant's Gab account was only one of several anonymized accounts the defendant utilized in the months following his release from state custody. The defendant created another such account—employing the username of "Sebastian Wolf," on Twitter—in December of 2021, which he thereafter utilized to broadcast white supremacist invective.




3. <u>Assembling Weapons & Explosives</u>

The defendant also (consistent with his instructions to his followers to exercise operational security) completed a number of anonymized online purchases from several different retailers, which were subsequently delivered to the defendant's residence in Henrico. Those purchases included a "G19 Build Kit" sold by US Patriot Armory to a "John Jackson"—a firearm build kit (for a 9mm Glock-style handgun) that included the slide, barrel, a lower parts kit, an upper receiver build kit, and a magazine—which was delivered to the defendant's residence on September 1, 2022. The defendant also completed other online purchases (again, utilizing aliases), on three different occasions in July and August of 2022, for lock-picking devices—including tools designed to allow the user to defeat the locking mechanisms of commercial doors, garage doors, vehicles, and other locks (such as padlocks). PSR ¶ 8.

The defendant built more than a half-dozen incendiary grenades: fully assembled Molotov cocktails, which the defendant constructed for additional lethality by adding Styrofoam to the gasoline mixture, thereby creating "a homemade version of improvised napalm." PSR ¶ 11.







The defendant also acquired the ammunition described in the Statement of Facts—including a box of 9mm hollow-point handgun rounds, the same caliber utilized by the 9mm handgun build kit the defendant had purchased anonymously online, and the same caliber the defendant had instructed his online followers to acquire.

The defendant acquired a 3D printer, and used that 3D printer—again, as he had instructed his online followers—to begin production of a 9mm Glock-style lower receiver, the sole remaining part necessary (when combined with the included components of his 9mm firearm build kit) to complete a functioning, untraceable handgun. When law enforcement officers searched the defendant's residence in November of 2022, they recovered the defendant's most recent printing attempt:






The defendant, in short, was not idle talk or harmless bluster—in the months following his release from state prison, he was tightly-wound and purposeful action, working steadily and stealthily towards the attack that would affirm his self-professed life purpose, and place him in the ranks of the mass murderers he admired and emulated. There is no reason *not* to believe that—had law enforcement officers not surged into the defendant's residence on November 13, 2022—the defendant would very shortly have possessed had the functioning weapon and explosive devices necessary to bring his years-long crusade to the climax he promised, and that he would have used those weapons and devices to kill and injure.

An upward variance to a sentence of 120 months appropriately and necessarily acknowledges and addresses the full extent of the defendant's criminal conduct— and in doing so, best accomplishes the additional sentencing factors of reflecting the seriousness of the offense, promoting respect for the law, and providing just punishment for the defendant's offense. *See* 18 U.S.C. § 3553(a)(2)(A).

**2. <u>History and Characteristics of the Defendant</u>**

The defendant was born in New York City; raised from age 3 to age 10 by a maternal aunt in Henrico, Virginia; and returned to New York from age 10 until approximately age 18, where he

lived with his paternal grandmother. PSR ¶¶ 44-50. The defendant returned to Virginia (and his aunt's residence) shortly graduating high school. PSR ¶ 50. The defendant has never been married, and he has no children. PSR ¶ 51.

The defendant describes himself as being in good physical health. PSR ¶ 54. The defendant reports having been diagnosed with Asperger Syndrome as a child, but he advised the Probation Officer that he "believes he grew out of it for the most part." PSR ¶ 56. The defendant describes an attempt to commit suicide in September 2018 (jumping off of the Huguenot Memorial Bridge), which he survived without significant injury, and after which he was hospitalized for approximately 10 days. PSR ¶ 57.[13] The defendant denies having any other suicidal ideations or attempts since that date. *Id*. The defendant also denies any substance or alcohol abuse. PSR ¶¶ 60-63.

The defendant has a high school degree, and completed one semester at John Tyler Community College in 2019. PSR ¶ 64. The defendant reports that he earned certificates as an entry level manufacturing technician and a manufacturing specialist. *Id*. The defendant's employment history consists of approximately one year at a temporary agency, during which time he worked on three job assignments for between one to three months each. PSR ¶¶ 66-67.

As noted above, the defendant is a convicted felon, stemming from his conviction in January 2021 for Intentional Damage to Property (Over or Equal to $1,000). PSR ¶ 35. The PSR notes that the defendant's offense conduct included his attempt to gain control of a knife during his transport in a police patrol car, and his violent and prolonged assault on the law enforcement officer who ordered the defendant to release the knife and who attempted to remove the defendant

---

[13] Following (previous) defense counsel's motion for a competency evaluation of the defendant, the Court ordered a psychological examination; the Licensed Clinical Psychologist who completed the examination concluded in his Report that (*inter alia*) the defendant was in fact competent to stand trial. PSR ¶ 59.

from the patrol car. *Id*. The defendant was ultimately sentenced to a term of five years' imprisonment, with four years suspended. *Id*.

While on supervised probation,[14] the PSR notes that the defendant deceived his Probation Officer for a period of months, reporting in January 2022 that he was enrolled in community college before (after being instructed to provide verification of this enrollment, and failing to do so) finally admitting in May of 2022 that he had never, in fact, been enrolled. *Id*.

The defendant also has a conviction for Trespassing from February of 2019, which the PSR notes involved an altercation between the defendant and his aunt. PSR ¶ 34. The defendant has a Criminal History Score of two, and a resulting Criminal History Category of II. PSR ¶¶ 36-38.

**3. <u>Need to Afford Adequate Deterrence</u>**

The Court must also weigh the need for the sentence imposed to afford adequate specific and general deterrence. 18 U.S.C. § 3553(a)(2). In this respect, the Government submits that an upward variance is also warranted.

The defendant's criminal history demonstrates the necessity of specific deterrence. Convicted and imprisoned for carrying out acts of violence driven by his white supremacist ideology, the defendant was forced to surrender his arsenal of assault rifle parts and ammunition. The defendant spent his year in prison brooding and planning—and when he emerged, he launched himself back into the same (but now, as a convicted felon, criminal) activity: acquiring ammunition, acquiring firearms parts, and building firearms. Not only had conviction and

[14] The terms of that supervised probation, the PSR notes, included the requirements that the defendant "surrender all firearms and firearm equipment, including ammunition and firearm parts," and that the defendant have "no contact with weapons of any kind, including firearms, ammunition and firearm parts." *Id*.

imprisonment failed to deter the defendant,[15] it had inspired him to *escalate*—in addition to renewing his labors to acquire ammunition and a firearm,[16] the defendant began constructing incendiary grenades. The defendant's purpose for this activity—expressed before, during, and after his imprisonment—was to deliver lethal violence to an increasing list of enemies and targets. A truly significant sentence is necessary to deter the defendant from committing further criminal activity upon his eventual release.

General deterrence is of equal importance. The defendant's offense conduct in this case, as described in the PSR and above, involved far more than his illegal possession of ammunition, or even his possession of incendiary grenades: the defendant sought to create untraceable firearms using his 3-D printer; and he incited and exhorted other individuals to follow his criminal lead, providing both practical and logistical advice and instructions (how to build untraceable firearms; how to build improvised explosive devices; how to conceal criminal activity from law enforcement). The sentence this Court delivers will send a necessary and clarion warning to the extremist community that the defendant operated and thrived in—a message that such criminality will be investigated, prosecuted, and punished to the fullest extent of the law.

An upward variance to a sentence of 120 months—the statutory maximum—will make clear to even the most vocal and committed domestic terrorists that their criminal activities will result in lengthy prison terms.

---

15 From the defendant's online posting of October 5, 2022: ". . . *no, being a convicted felon is not at all a valid excuse for remaining unarmed, stay strapped or get clapped. If you don't have a gun yet, at least acquire the means to make one, parts kits are everywhere and 3d printers are pretty cheap now too.*" Gov't Exhibit 2 at 3.

16 As noted previously, the defendant undertook these activities knowing they were in flagrant violation of the terms of his supervised probation. PSR ¶ 35.

### 4. **Need to Protect the Public**

The United States respectfully submits that the single most important sentencing factor before this Court in this case—informed by the factual considerations detailed in the preceding sections—is the need to protect the public from future crimes of the defendant.

Very simply put—the defendant wants to kill people. His professed ideological cloak for this desire—his purported rationale and justification for the murder of his fellow citizens—has morphed over time, veering between various offshoots of white supremacy. His fundamental focus, however, has remained constant: to acquire firearms, to acquire incendiary grenades and explosive devices, to amass ammunition—and to use those materials in an attack styled on and inspired by the massacres of Brenton Tarrant, Anders Brevik, and others.

A sentence of 120 months acknowledges the reality that the defendant viewed the criminal conduct before this Court—acquiring ammunition, building incendiary grenades, building an untraceable firearm—as merely a necessary prelude to the violence and chaos that he intended to unleash on his community. The Court's sentence should incapacitate this defendant—and concomitantly protect the community from his violent aims and plans—for as long as possible.

## **CONCLUSION**

For the reasons discussed above—but first and foremost, for the protection of the public—the United States respectfully requests that the Court vary upwards and sentence the defendant to a term of 120 months of imprisonment.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: /s/
Thomas A. Garnett

Assistant United States Attorney
Virginia Bar No. 86054
United States Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400
Fax: (804) 819-7417