**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**RICHMOND DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>XAVIER LOPEZ,<br><br>*Defendant*. | Case No. 3:23CR79 |

**UNITED STATES' RESPONSE TO DEFENDANT'S OBJECTIONS AND SENTENCING POSITION**

The United States of America, through its attorneys, Jessica D. Aber, United States Attorney, and Thomas A. Garnett, Assistant United States Attorney, hereby submits this *Response* to defendant Xavier Lopez's *Objections to Presentence Investigation Report* ("Def. Objections," Dk. No. 75) and *Sentencing Memorandum* ("Memorandum," Dk. No. 78).

The defendant's objections to the Presentence Investigation Report ("PSR," Dk. No. 79) are two-fold: first, to the application of a four-level enhancement pursuant to § 2K2.1(b)(6)(B); and second, to the PSR's notation that the defendant has a "gang affiliation" (specifically, that the Virginia Crime Information Network has characterized the defendant as a "White Supremacy Gang member"). Def. Objections at 1.

The United States opposes the defendant's first objection. The Probation Officer's application of the § 2K2.1(b)(6)(B) enhancement is consistent with the facts of this case, the Guidelines themselves, and relevant case law. The United States takes no position as to the Defendant's second objection, and defers to the Court's assessment on the designation.

Finally, the Defendant's Sentencing Memorandum advocates for a total sentence of 51 months' incarceration, and grounds that recommendation in large part on aspects of the

defendant's developmental history and diagnoses. The United States respectfully submits that a clear-eyed review of the facts and circumstances of the defendant's offense conduct establishes that the defendant was fully aware of the criminality of his actions, and that he took deliberate and carefully-considered action to avoid law enforcement detection (and counseled his online followers to do the same) so that he would be able to complete his preparations for an attack on his community with firearms and incendiary grenades. The defendant's sentence should reflect the reality and extent of the danger that he poses to this community.

The United States addresses these matters in further detail below.

**1. Defense PSR Objections**

***A. Section 2K2.1(b)(6)(B) Enhancement***

Section 2K2.1(b)(6)(B) of the Sentencing Guidelines assesses a four-point enhancement to a defendant's offense level when the defendant either (1) "used or possessed any firearm[1] or ammunition in connection with another felony offense," or (2) "possessed or transferred any firearm or ammunition with knowledge, intent, or reason to believe that it would be used or possessed in connection with another felony offense." U.S.S.G. 2K2.1(b)(6)(B).

The Probation Officer concluded that this enhancement applied (independently) to the defendant's possession of both the eight Molotov cocktails and the 9mm hollow-point handgun ammunition, noting that:

> ". . . the defendant possessed the ammunition with the clear intent to facilitate attacks on law enforcement officers, and thus in violation of Assault on a Law Enforcement Officer (Virginia Code 18.2-57), Malicious Wounding (Virginia Code 18.2-51), and Attempted Murder (Virginia Code 18.2-32). Additionally, [the defendant] possessed the destructive device in connection with Prohibited Paramilitary Activity (Virginia Code 18.2-433)."

[1] The Guidelines define a "firearm," for purposes of this section, as that term is defined at 18 U.S.C. § 921(a)(3)—which is to say, a category of weapons inclusive of the type of "destructive device"—the eight Molotov cocktails—the defendant possessed at his Henrico residence. U.S.S.G. 2K2.1 comment. (n. 1).

PSR at page A-2 (emphases added).

The United States concurs with this common-sense conclusion, which is abundantly supported by the undisputed facts of the case as outlined in the defendant's PSR, and consistent with the plain language of the Sentencing Guidelines and a host of circuit court authority.

1. The Enhancement Applies to *Potential* and *Contemplated* Felony Offenses

The defendant's objection to the application of this enhancement rests primarily on his assertion that he has not *yet* committed any of the enumerated "other felony offenses" noted by the Probation Officer. This is both accurate and irrelevant, relying as it does on the necessary and implicit argument that the actual consummation of such "another felony offense" is a necessary prerequisite for § 2K2.1(b)(6)(B)'s application. This reading is contradicted, however, by the plain language of the Guidelines themselves, as well as a host of circuit court authority.

At the outset, the Commentary to this enhancement makes clear that the Sentencing Commission was equally concerned about the *potential* usage of the firearm/ammunition in question—stating unequivocally that the sentencing court is to apply (b)(6)(B) when ". . . the firearm or ammunition facilitated, *or had the potential of facilitating*, another felony offense." U.S.S.G. § 2K2.1, comment. (n. 14(A)) (emphasis added). The plain language of the controlling commentary, in other words, establishes that the Commission intended for the application to apply *regardless* of whether the "other felony offense" in question had actually been completed.

The Commission's plain language instructions have been consistently noted and affirmed by numerous circuit courts of appeal. The Eighth Circuit, confronting a defendant's argument that the sentencing district court had "erred in applying the enhancement[2] because he did not commit

[2] At the time (1999, employing the 1998 Sentencing Guideline Manual), the enhancement in question was set forth at § 2K2.1(b)(5)—but was identical in verbiage to today's § 2K2.1(b)(6)(B).

another felony offense," held flatly that the "[t]his Guideline does not require the actual commission of another felony offense." *United States v. Fredrickson*, 195 F.3d 438, 440 (8th Cir. 1999). The Eighth Circuit pointed out that its straightforward conclusion was consistent with both the plain language of the guideline itself and the great weight of circuit court authority, citing to the like-minded decisions of the First, Second, Fourth, and Seventh Circuit Courts of Appeal. *Id*.

The Fourth Circuit, reviewing a challenge to the application of § 2K2.1(b)(6)(B)'s literatim predecessor, dismissed the defendant's argument that the United States had not established the "defendant's knowledge of a specific felony offense" intended to be committed, noting that interpreting the plain language of the enhancement was not a difficult task: "We have previously stated that the Sentencing Guidelines should be applied as written. As written, § 2K2.1(b)(5) does not require a defendant's knowledge of a specific offense to be committed." *United States v. Cutler*, 36 F.3d 406, 408 (4th Cir. 1994) (internal citation omitted). While a defendant might "like the section to read 'another specific felony offense,'" the court observed dryly, "it does not." *Id*. The Fourth Circuit likewise rejected the defendant's appeal to the "rule of lenity," pointing out that the rule is not to be applied "unless there is a 'grievous ambiguity or uncertainty in the language and structure' of a statute"—a situation not implicated by this particular guideline enhancement, which is "clear on its face." *Id*. (quoting *Chapman v. United States*, 500 U.S. 453, 463 (1991)).

The Eleventh Circuit more recently (but in equally matter-of-fact fashion) rejected a defendant's argument that the court should not apply § 2K2.1(b)(6)(B) because the "another felony offense" contemplated by the sentencing court "was only a someday intention to do something in the future," rather than a consummated felonious act. *United States v. Martinez,* 964 F.3d 1329, 1335 (11th Cir. 2020). The court held that the enhancement applied irrespective of the undisputed fact that the defendant had *not* actually committed another felony offense, because "[t]he clear

language of the guideline and its commentary tells us that section 2K2.1(b)(6)(B) applies to "would be" and "potential" felonies." *Id*. The "enhancement is triggered," the Court explained, "if the government proves by a preponderance of the evidence that the defendant knew, intended, or had reason to believe" that the firearm or ammunition that he possessed "was going to be used or possessed in connection with another felony offense, and the second felony would have happened but for the defendant's arrest or something else getting in the way." *Id*.

Application of § 2K2.1(b)(6)(B) requires, in short, only that the United States establish by a preponderance of the evidence that the defendant knew, intended, or even merely had "reason to believe" that his possession of (1) the 9mm hollow-point handgun ammunition *or* (2) Molotov cocktail devices hand-crafted to deliver flaming napalm onto their target was "in connection with" his commission of any other future felony offense.

The Fourth Circuit has stressed, additionally, that the "standard for applying § 2K2.1(b)(6)(B) 'is not especially burdensome.'" *United States v. Dix*, 64 F.4th 230, 238 (4th Cir.), cert. denied, 144 S. Ct. 437 (2023) (quoting *United States v. Bolden*, 964 F.3d 283, 287 (4th Cir. 2022). A district court's conclusion that application of the enhancement is warranted is reviewed pursuant to the deferential clear error standard, and "we will not disturb the district court's finding unless we are 'left with the definite and firm conviction that a mistake has been committed.'" *Bolden*, 964 F.3d at 287 (quoting *United States v. Dugger*, 485 F.3d 236, 239 (4th Cir. 2007)).

2. <u>The Defendant Possessed Ammunition and Molotov Cocktails in Connection with Other Felony Offenses</u>

The undisputed record in this case makes abundantly clear that the defendant's fundamental *purpose* for acquiring and possessing these two items (the 9mm ammunition and the Molotov cocktails) was "in connection" with a host of other future felony offenses, both state and

federal—a list that includes those offenses specifically enumerated by the Probation Officer, and additional felony statutes.

*a. Offenses Relating to the Defendant's Planned Attacks on Law Enforcement Officers, Racial Minorities, and Religious Minorities: Assault, Malicious Wounding, Attempted Murder, Murder, Hate Crimes, and Use of a Firearm During a Crime of Violence*

The defendant possessed the ammunition and destructive devices in question because he planned and intended to use those materials to kill and injure other individuals during the execution of his oft-discussed, long-planned-for, carefully-considered attack on police officers and racial and religious minorities. The massacre the defendant envisioned—and the actions he took to gain control of the arsenal that would enable his attack—would of course constitute and involve obvious violations of a host of federal and state criminal statutes. The defendant, as further detailed below, thus clearly "possessed" both the 9mm hollow-point handgun ammunition *and* his eight Molotov cocktails "with knowledge, intent, or reason to believe that [the ammunition and devices] would be used or possessed in connection" with the defendant's plans to attack law enforcement officers and to attack religious and racial minorities. *See, e.g.*, PSR ¶¶ 7-13.[3]

Even before completing his state prison sentence in 2021, the defendant had explicitly informed his family member that he intended to "build guns, explosives, and other forms of weaponry" for use in "shed[ding] the blood" of individuals that he hated—specifically, "Jews." *See* Gov't Exhibit 1 at 3, 5. In his subsequent online postings, the defendant explained to online followers and associates not just *how* to build untraceable firearms and explosive devices, but *why* it was necessary to do so—urging others to "gather the necessary info and supplies" in order to

---

[3] The defendant explicitly reaffirmed—post-arrest—his intention to shoot law enforcement officers: "Lastly, after an FBI TFO recited to the defendant one of his online postings pertaining to the lack of tolerance for law enforcement and shooting them if they come to your residence, the defendant responded, 'If you have the means.'" PSR ¶ 13.

"hit multiple targets" and "do as much surgical damage as you can." *See* Gov't Exhibit 2 at 4.

Indeed, there is no plausible reason for the defendant's possession of the Molotov cocktails recovered from his bedroom other than for employment as weapons of war: the FBI Laboratory's forensic examination of those devices found both that the devices were functional and that they had been constructed for "lethality and destructive capability" by the defendant's deliberate decision to add polystyrene to each device—"creating a homemade version of liquid napalm." PSR ¶ 14.[4] In an online posting made just two months before his arrest, the defendant explained that he aspired to mimic and *surpass* the slaughter executed by Anders Behring Breivik—a far-right mass murderer who employed both an explosive device and firearms in an attack that killed more than 70 and wounded hundreds.[5] *See* Gov't Exhibit 2 at 4 (Regarding attacks that "*hurt the kike system . . . Brevik was the best example of this thus far, but we can do even better*.").

The defendant's plan to attack law enforcement officers and others would of course constitute violations of numerous Virginia felony criminal statutes, as detailed above.[6]

Additionally, given that the defendant's selection of attack targets was explicitly based on his animus towards certain racial and religious minorities, those assaults (and/or homicides) would

---

4 Likewise with the defendant's decision to acquire *hollow-point* bullets—ammunition designed and manufactured specifically to "result in enhanced injuries beyond ordinary bullets" due to the "expansion mechanism of the bullets, which causes ripping and tearing in its victims." *McCarthy v. Olin Corp.*, 119 F.3d 148, 155 (2d Cir. 1997). Such ammunition—because of its specialized design—is "significantly more expensive" than the alternative "ball" ammunition. "Hollow Point vs. Ball Duty Ammo," by Carter K. Lord, July 1997 (https://www.ojp.gov/ncjrs/virtual-library/abstracts/hollow-point-versus-ball-duty-ammo#:~:text=Compared%20to%20ball%20ammunition%2C%20hollow,manufacturers%2C%20and%20other%20independent%20investigations.)

5 "Anders Behring Breivik, Killer in 2011 Norway Massacre, Is Denied Parole," New York Times, Feb. 1, 2022 (https://www.nytimes.com/2022/02/01/world/europe/anders-behring-breivik-norway-parole.html).

6 Deliberately assaulting, wounding, and killing law enforcement officers and other individuals (and attempting to do so) would violate Virginia Code Sections 18.2-57 (Assault on a Law Enforcement Officer), 18.2-51 (Malicious Wounding), and 18.2-32 (First and Second Degree Murder).

clearly constitute violations of *federal* criminal civil rights statutes and associated federal firearms statutes (*e.g.*, Title 18, United States Code, § 249 (Hate Crimes Involving Attempts to Kill) and § 924(c) (Use of a Firearm During and in Relation to a Crime of Violence)).

*b. Offenses Related to the Defendant's Possession and Attempted Possession of a Firearm as a Convicted Felon*

The defendant possessed the 9mm hollow-point handgun ammunition with the "knowledge, intent, or reason to believe that [the ammunition] would be used or possessed in connection" with the defendant's possession of the untraceable 9mm handgun that the defendant was building (and had almost completed) in his bedroom workshop. The defendant's possession of a completed firearm (as a convicted felon) would constitute a violation of Section 922(g)(1) of Title 18; additionally, the defendant's *attempted* possession of that 9mm firearm is a clear violation of Virginia criminal code's prohibition of an *attempt* to violate Virginia's equivalent prohibition of possession of a firearm by a convicted felon (*see* Virginia Code §§ 18.2-308.2 and 26).[7]

The defendant's possession of that 9mm handgun ammunition, in short, was not just "in connection with" the defendant's anticipated, sought-after possession of a 9mm handgun—the specific end purpose of (illegal) firearm possession was the entire *raison d'être* for the defendant's decision to acquire and store those bullets within feet of that almost-completed 9mm handgun.

*c. Offense Related to Paramilitary Activity*

The defendant's possession of <u>both</u> that same 9mm handgun ammunition and the eight napalm-enhanced Molotov cocktails was likewise clearly "in connection with" the defendant's ongoing commission (or at the very least, the attempted commission) of Virginia's prohibition on Paramilitary Activity, set forth at Virginia Code § 18.2-433.2.

---

[7] The general-purpose Attempt statute codified at VA Code § 26 provides for the felony prosecution of an attempt to commit <u>any</u> substantive felony offenses (other than Class 1 Felonies).

The Virginia statute criminalizes (1) the "teach[ing]" or "demonstrat[ion]" of "the use, application, or making of any firearm, explosive or incendiary device" when the teacher/demonstrator knows or has "reason to know or intend[]" that this training will be employed during or in furtherance of a civil disorder; and (2) the assembly of two or more individuals for the purpose of "training with, practicing with, or being instructed in the use of any firearm, explosive or incendiary device" for the same forbidden purpose of facilitating a civil disorder. VA Code § 18.2-433.2. The statute, in short, has two necessary elements for both subsections: *first*, that the defendant undertook specified actions (teaching/demonstrating certain activities; assembling to train on/practice certain activities); and *second*, that the defendant took those actions for a specified purpose (with the intent that the training would be employed in furtherance of a civil disorder).

The defendant's undisputed online activity—his instructions and exhortations to his online followers about (1) how to acquire the tools and parts necessary to manufacture untraceable firearms[8]; (2) his forceful pronunciations to his online associates about the importance of acquiring such untraceable firearms[9]; (3) his explanations about how to manufacture improvised explosive devices[10]; and (4) his dissemination of video tutorials detailing precisely how to create a 3D-printed "ghost gun"[11]—all clearly satisfy the statute's first prong.

---

[8] *See*, *e.g.*, Gov't Ex. 2 at 2: "all real weapons should be built, not bought. This can be done with a 3D printer and a parts kit, both of which can easily be bought untraceably . . ."

[9] *See*, *e.g.*, Gov't Ex. 2 at 2: "@Lilr and no, being a convicted felon is not at all a valid excuse for remaining unarmed, stay strapped or get clapped. If you don't have a gun yet, at least acquire the means to make one, parts kits are everywhere and 3d printers are pretty cheap now too. You can also have a decent side hustle selling your builds to our white brothers across the pond and all around the world for monero over TOR or isp."

[10] *See*, *e.g.*, Gov't Ex. 2 at 3: ". . . manufacture pipe bombs using match heads or mix acetone and either 35% peroxide and Styrofoam" in order to "take over territory and destabilize the system."

[11] *See*, *e.g.*, Gov't Ex. 2 at 5 (the defendant's dissemination to his online followers and associates of a video tutorial on 3D printing firearms).

The defendant's own words—expressed repeatedly and forcefully—likewise establish his precise *purpose* in providing these instructions and demonstrations: to encourage the establishment of an armed militia, equipped with such untraceable firearms and improvised explosive devices, for the purpose of executing violent attacks on law enforcement officers and racial and religious minorities.[12]

The uncontested evidence before the Court clearly establish (and certainly by a preponderance of the evidence standard) that the defendant possessed ammunition and Molotov cocktails "in connection with" the defendant's criminally-prohibited efforts to teach and demonstrate the creation and employment of manufactured firearms and explosive devices to other, like-minded individuals with the intent that this training would ultimately be employed in attacks against government authorities and other members of their community, in violation of VA Code § 433.2.

### *B. Gang Affiliation*

The defendant objects to the PSR's notation that the defendant has a "gang affiliation," arguing that while the defendant "may believe in White Supremacy," this is an ideology, not a "gang." Def. Objection at 10-11; PSR at page A-3, ¶ 35. The United States Probation Officer declined to amend the PSR, noting that the Virginia Crime Information Network (VCIN) listed the defendant as "a possible terrorist organization member [. . .] and "a White Supremacy Gang member." PSR at page A-3, ¶ 35.

While there is no dispute that the PSR's characterization of the defendant as possessing a gang affiliation does not affect the defendant's guidelines calculations, the defense objects due to

---

[12] *See, e.g.*, Gov't Ex. 2 at 2 (Detailing the arming and equipping of a militia in a post prefaced with "how to have a proper organization"); Gov't Ex. 2 at 4 (". . . gather people you know you can trust enough to act in concert with you"); Gov't Ex. 2 at 1 (". . . start ganging up on and beating every nigger and kike you see").

the "ramifications" that this designation could have on the Bureau of Prisons' decisions about the defendant's security level and housing placement. *Id*.

The United States respectfully submits that the record before the Court reflects that the defendant adheres to a violent white supremacy ideology, and that this belief system was the underpinning for his plans to attack, injure, and kill racial and religious minorities. The record also establishes that the defendant communicated with other individuals who adhered to a white supremacy worldview, and that those communications included discussions about committing physical violence against racial and religious minorities. The United States does not possess evidence establishing that the defendant belonged to a specific white supremacist movement or organization, however, and as such, defers to the Court's assessment of the applicability of the "gang affiliation" designation noted in the PSR.

**2. <u>Defense Sentencing Recommendation</u>**

The United States responds briefly to the defendant's sentencing position's argument that his diagnosis with a developmental condition warrants a sentence of only 51 months. The United States' *Motion for Upward Variance* (Dk. No. 83) and the defendant's PSR (Dk. No. 79) lay out in fulsome detail the nature and scope of the defendant's offense conduct, and the undersigned incorporates the arguments and factual information contained in those documents.

The United States respectfully submits that the nature of the defendant's developmental diagnosis is not particularly unique, and that this diagnosis cannot be fairly said to predispose an individual to the nature and extent of the criminal activity that this particular defendant pursued with apocalyptic fervor. The defendant's developmental diagnosis did not preordain the defendant's decision to choose to devote years of his life to researching and planning a violent attack; building illegal weapons; or manufacturing incendiary grenades. Functionally, the

defendant's developmental make-up did not prevent him from fully recognizing the illegality of his actions—to the contrary, he took careful and deliberate steps to conceal his identity from law enforcement when purchasing firearms parts and burglary tools, and he counseled others on tactics and techniques designed to hide criminal activity from possible detection. He did so because he knew that his plans and actions were against the law, and because he was determined to prevent law enforcement from uncovering his plans and moving to stop him from bringing his homicidal visions into reality.

The United States respectfully submits that the most pressing consideration before the Court remains whether the defendant poses a risk of harm to his community—and especially to those members of the minority groups that the defendant believes with terroristic fervor should be eliminated. He does. The Court's sentence should reflect that reality, and serve to protect the community from further crimes of the defendant to the greatest extent possible.

## CONCLUSION

For the reasons discussed above, the United States respectfully opposes the defendant's objections to the Presentence Investigation Report, and recommends that the Court sentence the defendant to a term of 120 months of imprisonment.

Respectfully submitted,

Jessica D. Aber
United States Attorney

By: /s/
Thomas A. Garnett
Assistant United States Attorney
Virginia Bar No. 86054
United States Attorney's Office
919 E. Main Street, Suite 1900
Richmond, Virginia 23219
Phone: (804) 819-5400
Fax: (804) 819-7417